**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | **ORDER DENYING DEFENDANT'S** |
| | ) | **MOTION TO SUPPRESS EVIDENCE** |
| vs. | ) | |
| | ) | |
| Fidel Diaz-Quintana, | ) | Case No. 1:08-cr-064 |
| | ) | |
| Defendant. | ) | |

_____

Before the Court is the Defendant's motion to suppress evidence filed on November 14, 2008. See Docket No. 19. On December 3, 2008, the Government filed a response in opposition to the motion. See Docket No. 26. The Defendant filed a reply brief on December 15, 2008. See Docket No. 27. The Court denies the motion for the reasons set forth below.

**I.     BACKGROUND**

On August 22, 2008, the defendant, Fidel Diaz-Quintana, was driving westbound on Interstate 94 near Dickinson, North Dakota when he was pulled over at 2:33 p.m. by North Dakota Highway Patrol Trooper Christopher Messer for driving 88 mph in a 75 mph zone. Diaz-Quintana was driving a 2003 Jaguar with Washington license plates. His adult son was a passenger in the vehicle. Trooper Messer, an eight-year veteran of the Highway Patrol, requested Diaz-Quintana's driver's license, registration, and proof of insurance. Diaz-Quintana produced a Mexican driver's license bearing the name "Fidel Diaz-Quintana" and informed Trooper Messer that his passport and visa were in Washington. Diaz-Quintana failed to provide any documentation of his legal status in the United States. He told Trooper Messer that the vehicle belonged to a relative and that he and his son were returning to Washington after attending a funeral in Grafton, North Dakota. Trooper

Messer contacted the United States Border Patrol at 2:46 p.m. to determine Diaz-Quintana's immigration status because he was unable to verify the validity of the Mexican driver's license. Trooper Messer was informed that a Border Patrol Agent would contact him.

Based on his training and experience, Trooper Messer noticed several indicators of criminal activity during the traffic stop: the vehicle did not belong to the driver or passenger; the vehicle had out-of-state license plates; and the trip was short in duration for the long distance covered. Because of these indicators, Trooper Messer asked North Dakota Highway Patrol Trooper Shawn Skogen to have his drug-detecting dog inspect the vehicle. Trooper Skogen arrived at 2:53 p.m. and had his dog inspect the vehicle. At 2:58 p.m., Border Patrol Agent Mark Bane called Trooper Messer and talked with Diaz-Quintana. Diaz-Quintana identified himself as "Fidel Diaz-Quintana," a Mexican national, and stated that he entered the United States legally with a Mexican passport. Agent Bane informed Trooper Messer that he would investigate the status of Diaz-Quintana's visa and passport. Agent Bane's record check, using Diaz-Quintana's name and date of birth, did not return any immigration history or port-of-entry crossing or visa information.

As Trooper Skogen's drug-detecting dog inspected the vehicle, Trooper Messer issued Diaz-Quintana a speeding citation. The dog did not detect any drugs. At 3:10 p.m., Agent Bane called Trooper Messer and again spoke with Diaz-Quintana. Diaz-Quintana confirmed that he had used the name "Fidel Diaz-Quintana" on his visa application. Agent Bane performed another record check that did not return any immigration history or port-of-entry crossing or visa information. At 3:20 p.m., Agent Bane instructed Trooper Messer to transport Diaz-Quintana to the Stark County Law Enforcement Center in Dickinson, North Dakota so that a Border Patrol official could travel to Dickinson and take custody of him. Trooper Messer took Diaz-Quintana into administrative

custody and transported him to the law enforcement center, where he was booked and fingerprinted at 3:48 p.m.

On August 23, 2008, at approximately 11:00 a.m., Border Patrol Agent Benjamin Lotvedt arrived at the Stark County Law Enforcement Center and subsequently transported Diaz-Quintana to the Border Patrol station in Portal, North Dakota for administrative processing. Agent Lotvedt fingerprinted Diaz-Quintana and inquired about basic biographical information, such as his name, date and place of birth, parents' names, and address in Mexico. At 3:30 p.m., Diaz-Quintana was advised of his right to speak with a Mexican consular official. He declined to do so. An analysis of Diaz-Quintana's fingerprints indicated prior criminal and immigration history under the name "Saul Rojo-Flores." The criminal history revealed a 1989 conviction for unlawful delivery of a controlled substance and a 1996 conviction for unlawful possession of a controlled substance with intent to deliver. The immigration history revealed deportation proceedings initiated on January 19, 1990, and August 21, 1996.

Upon the discovery of Diaz-Quintana's criminal and immigration history, Agent Lotvedt placed Diaz-Quintana under arrest and advised him of his Miranda rights in English at 5:30 p.m. Diaz-Quintana stated that he understood his rights and agreed to answer questions. Diaz-Quintana told Agent Lotvedt that he had previously been ordered to be removed from the United States; that on or about May 1, 2008, he re-entered the United States through the port-of-entry in San Ysidro, California, with a valid Mexican passport; and that he did not apply to the United States Attorney General for permission to re-enter the United States. There is no record of Diaz-Quintana or "Saul Rojo-Flores" entering a port-of-entry with a valid Mexican passport in the past year. There are no

records that indicate Diaz-Quintana or "Saul Rojo-Flores" had ever applied for or been granted permission to re-enter the United States.

Diaz-Quintana was indicted on September 23, 2008, with "Re-entry of Deported Alien Subsequent to Prior Aggravated Felony Conviction." <u>See</u> Docket No. 13. The indictment alleges that Diaz-Quintana, an alien who had been previously deported and removed from the United States subsequent to an aggravated felony conviction, knowingly and unlawfully entered and was found in the United States without first obtaining the consent of the Attorney General of the United States or his successor, the Secretary for Homeland Security, to reapply for admission into the United States.

Diaz-Quintana moves the Court "to find that there was an unlawful and unconstitutional seizure . . . in violation of the Fourth Amendment, and that any and all statements made to the border patrol, as well as fingerprints and any other evidence pertaining to the defendant's identity, secured following the unconstitutional seizure be suppressed as violative" of the Defendant's Fourth and Fifth Amendment rights. <u>See</u> Docket No. 20. Diaz-Quintana contends that he was unlawfully detained at the Stark County Law Enforcement Center in Dickinson, North Dakota, and the Border Patrol station in violation of his Fourth Amendment rights, and that his Fifth Amendment rights were violated because he was interrogated while unlawfully held in custody and before being read his <u>Miranda</u> rights. Diaz-Quintana argues that his statements to Agent Lotvedt were the fruit of a Fourth Amendment violation and, therefore, must be suppressed.

The Government contends that reasonable suspicion existed with respect to non-criminal violations of immigration laws and, therefore, the Border Patrol properly initiated a civil administrative seizure of Diaz-Quintana which legally developed into probable cause to believe a

crime had been committed. The Government argues that once the Border Patrol learned that there was no port-of-entry crossing or visa information that pertained to Diaz-Quintana, there was reason to believe that Diaz-Quintana was in the United States illegally. The Government contends that the information gathered by Trooper Messer and Agents Bane and Lotvedt was obtained as part of an administrative deportation process and is admissible in a criminal proceeding. The Government further contends that once Agent Lotvedt had probable cause to believe that Diaz-Quintana had a criminal history and had been previously deported, Agent Lotvedt properly read Diaz-Quintana his Miranda rights. Therefore, Diaz-Quintana's post-Miranda statements are admissible.

## II.    LEGAL DISCUSSION

### A.    FOURTH AMENDMENT

The United States Constitution guarantees the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. United States v. Fuse, 391 F.3d 924, 927 (8th Cir. 2004). A traffic stop is considered a seizure within the meaning of the Fourth Amendment. The principles of Terry v. Ohio, 392 U.S. 1, 20 (1968) (holding that a law enforcement officer may conduct an investigation "reasonably related in scope to the circumstances which justified the interference in the first place"), govern such stops. See Fuse, 391 F.3d at 927. "[A] traffic 'stop must be supported by at least a reasonable, articulable suspicion that criminal activity' has occurred or is occurring." Id. (quoting United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001)).

In this case, Diaz-Quintana does not challenge the validity of the traffic stop. A traffic violation creates probable cause to stop a vehicle. United States v. Linkous, 285 F.3d 716, 719 (8th

Cir. 2002). When there is a valid traffic stop, a law enforcement officer may "conduct an investigation reasonably related in scope to the circumstances that initially prompted the stop." United States v. McCoy, 200 F.3d 582, 584 (8th Cir. 2000) (citing United States v. Bloomfield, 40 F.3d 910, 915 (8th Cir. 1994)). It is well-established that as part of a reasonable investigation, an officer "may request the driver's license and registration, request that the driver step out of the vehicle, request that the driver wait in the patrol car, conduct computer inquiries to determine the validity of the license and registration, conduct computer searches to investigate the driver's criminal history and to determine if the driver has outstanding warrants, and make inquiries as to the motorist's destination and purpose." Jones, 269 F.3d at 924.

An officer may detain the driver as long as reasonably necessary to conduct these activities and to issue a warning or citation. Jones, 269 F.3d at 925 (citing United States v. Wood, 106 F.3d 942, 945 (10th Cir. 1997)). Once the officer has completed these activities, the traffic stop is over, but not until that time. See Jones, 269 F.3d at 925 (citing United States v. White, 81 F.3d 775, 778 (8th Cir. 1996) (holding that a traffic stop ends when the documentation has been returned and an explanation of the citation has been given); Bloomfield, 40 F.3d at 916 (holding that the reasonable scope of an initial traffic stop extends to the moment after the return of documents when the officer asks to search the car)). In other words, "if a defendant is detained incident to a traffic stop, the officer does not need reasonable suspicion to continue the detention until the purpose of the traffic stop has been completed." United States v. Bueno, 443 F.3d 1017, 1025 (8th Cir. 2006).

Once the purpose of the traffic stop has been completed, an officer may lengthen the stop or expand the scope of the stop only with a reasonable, articulable suspicion needed to justify further detention. See Jones, 269 F.3d at 925. For example, if the driver's responses and "'the

circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry and satisfy those suspicions.'" United States v. Barragan, 379 F.3d 524, 529 (8th Cir. 2004) (quoting United States v. Barahona, 990 F.2d 412, 416 (8th Cir. 1993)). The officer's suspicion must be based on "particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." Jones, 269 F.3d at 927 (internal quotations omitted). In determining whether reasonable suspicion exists, the court must consider the totality of the circumstances. In doing so, the court may consider any added meaning that certain conduct may suggest to experienced law enforcement officers in the field, trained in the observation of criminal activity. Id. (citing United States v. Cortez, 449 U.S. 411, 417 (1981); United States v. Beck, 140 F.3d 1129, 1136 (8th Cir. 1998)).

Diaz-Quintana contends that, although the original traffic stop for speeding was valid, it was improperly prolonged and expanded when he was taken to the law enforcement center and the Border Patrol station. Diaz-Quintana acknowledges that once the purpose of the traffic stop was completed, "the only justifiable basis for expanding the stop was if the officer [had] a reasonable articulable suspicion that justified further detention." See Docket No. 20. Diaz-Quintana argues that the law enforcement officers "had no reason to believe that [he] was an illegal alien, other than [his] last name and the border patrol agent's inability to find any verifying information concerning [Diaz-Quintana]." See Docket No. 20. Therefore, Diaz-Quintana contends that after he answered Trooper Messer's questions, after the drug-detecting dog did not find any drugs, after the speeding citation was issued, and when no evidence linking Diaz-Quintana to criminal activity was found, "no further legitimate basis existed for [his] detention . . . and the detention and anything occurring after the detention must be suppressed." See Docket No. 20.

Diaz-Quintana contends that there was no reasonable and articulable suspicion to extend the detention for the purpose of investigating his immigration status. When Diaz-Quintana was stopped and questioned by Trooper Messer, the only identification he produced was a Mexican driver's license. He informed Trooper Messer that his passport and visa were in Washington and, thus, failed to provide any documentation of his legal status in the United States. When Diaz-Quintana talked to Border Patrol Agent Bane, he identified himself as a Mexican national, and stated that he entered the United States legally with a Mexican passport. However, multiple record checks failed to corroborate this information. Instead, no information whatsoever was found concerning Diaz-Quintana's immigration status. At that point, Trooper Messer and Agent Bane clearly had sufficient reasonable suspicion to detain Diaz-Quintana long enough to determine his immigration status. Therefore, the Court finds that there was a reasonable and articulable suspicion to detain Diaz-Quintana beyond the original traffic stop for the purpose of investigating his immigration status.

Diaz-Quintana further contends that he was "de facto" arrested when he was taken to the Stark County Law Enforcement Center and then to the Border Patrol station. This argument requires that the Court determine whether at some point in time Diaz-Quintana's detention became a "de facto" arrest that would have required probable cause rather than a reasonable and articulable suspicion. A stop may become an arrest that requires probable cause if it lasts for an unreasonably long time. United States v. Maltais, 295 F. Supp. 2d 1077, 1088 (D.N.D. 2003). However, obvious exigencies allow law enforcement officers to continue an investigative stop to stabilize a situation until they can determine whether full custodial arrest is warranted. Id. at 1089 (citing United States v. Lego, 855 F.2d 542, 545 (8th Cir. 1988)). "Actions by law enforcement officers that 'maintain the status quo' and 'stabilize the situation,' pending the quickest means of investigation reasonably

available to confirm the officers' suspicion, do not transform an investigatory detention into an arrest as long as the actions of the officers are not dilatory." Maltais, 295 F. Supp. 2d at 1089 (quoting United States v. Dickson, 58 F.3d 1258, 1264 (8th Cir. 1995)).

It is undisputed that Diaz-Quintana was detained for an extended period of time – approximately twenty-four hours – while his immigration status was being investigated. However, obvious exigencies existed as the law enforcement officers attempted to determine Diaz-Quintana's immigration status. Diaz-Quintana was first transported to the Stark County Law Enforcement Center in Dickinson, North Dakota, after the initial traffic stop so that a Border Patrol official could take custody of him. Agent Lotvedt had to travel more than 200 miles from the Border Patrol station in Portal, North Dakota, to pick up Diaz-Quintana, and then had to transport Diaz-Quintana back to the Border Patrol station. The Government explains that it was necessary to transport Diaz-Quintana to the Border Patrol station because that is the location of "IDENT," "an automated identification system that records a digital print from the index finger of each hand and a digital photograph of each illegal entrant over 14 who is apprehended by Border Patrol agents or other immigration officer[s]." See Docket No. 26. These unique circumstances required a longer period of detention to determine Diaz-Quintana's immigration status.

The Court finds that Agent Lotvedt, by transporting Diaz-Quintana to the Border Patrol station, was merely stabilizing the situation while attempting to resolve the investigation of Diaz-Quintana's immigration status in the quickest manner possible. Transporting Diaz-Quintana to the Border Patrol station was necessary for a complete investigation into his immigration status and to determine whether full custodial arrest was warranted. There is no evidence that the law enforcement officers were at any time dilatory in their actions.

The actions of the law enforcement officers are further supported by 8 C.F.R. § 287.8(b), entitled "Interrogation and detention not amounting to arrest," which states, in part:

(2) If the immigration officer has reasonable suspicion, based on specific articulable facts, that the person being questioned is, or is attempting to be, engaged in an offense against the United States or is an alien illegally in the United States, immigration officer may briefly detain the person for questioning.

(3) Information obtained from this questioning may provide the basis for a subsequent arrest . . . .

Agent Lotvedt and Trooper Messer indicate in their affidavits that Diaz-Quintana was to be taken into administrative custody. The Government contends that Agent Bane directed Trooper Messer to take Diaz-Quintana into administrative custody because Agent Bane intended to instigate administrative deportation proceedings, not criminal charges. At this stage, there was no reason to believe that Diaz-Quintana had violated any criminal laws; he was only suspected of being in the country illegally. Therefore, Diaz-Quintana was briefly detained in compliance with 8 C.F.R. § 287.8(b) because there was a reasonable suspicion that he was an alien illegally in the United States.

"It would have been extremely poor police work and incompetence to have done nothing and to have failed to take any steps to detain [Diaz-Quintana] to further investigate the matter." Maltais, 295 F. Supp. 2d at 1089. Accordingly, the Court finds that Diaz-Quintana was not under custodial arrest when he was transported to the Stark County Law Enforcement Center and then to the Border Patrol station. Instead, he was merely going through the administrative processing necessary to fully investigate his immigration status and to determine whether full custodial arrest was warranted. Therefore, Diaz-Quintana was not "de facto" arrested and was not detained in violation of his Fourth Amendment rights.

**B.     FIFTH AMENDMENT**

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend V. To that end, "[w]hen taken into custody for questioning, an individual must be advised of the rights to be free from compulsory self-incrimination, and to the assistance of counsel." United States v. Black Bear, 422 F.3d 658, 661 (8th Cir. 2005) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1983)). "*Miranda* warnings are required only where a person is deemed to be in custody." Black Bear, 422 F.3d at 661 (citing Oregon v. Mathiason, 429 U.S. 492, 495 (1977)).

"The ultimate inquiry to determine custody for *Miranda* purposes is whether there was a formal arrest, or restraint on freedom of movement of the degree associated with a formal arrest." Black Bear, 422 F.3d at 661(citing California v. Beheler, 463 U.S. 1121, 1125 (1983)). The Court must first consider the totality of the circumstances of the historical facts that confronted Diaz-Quintana at the time of questioning. See Black Bear, 422 F.3d at 661. Second, the Court must determine whether a reasonable person in Diaz-Quintana's position would have considered his freedom of movement restricted to the degree associated with a formal arrest. "This determination is based on the objective circumstances, not on subjective views of the participants." Id.

Diaz-Quintana contends that his Fifth Amendment rights were violated when he was not read his Miranda rights while being detained by Trooper Messer. It is well-established that Miranda warnings are not needed for persons detained for a Terry stop. United States v. Pelayo-Ruelas, 345 F.3d 589, 592 (8th Cir. 2003) (citing United States v. McGauley, 786 F.2d 888, 890 (8th Cir. 1986)). The Eighth Circuit has rejected the "broad contention that a person is in custody for *Miranda* purposes whenever a reasonable person would not feel free to leave." Pelayo-Ruelas, 345 F.3d at

11

592.  Instead, "[o]ne is not free to leave a *Terry* stop until the completion of a reasonably brief investigation, which may include limited questioning. But most *Terry* stops do not trigger the detainee's *Miranda* rights." Id.  By way of extension, "the full panoply of protections prescribed by *Miranda* does not apply during the course of a traffic stop where the motorist is not subjected to the functional equivalent of formal arrest." United States v. Martin, 411 F.3d 998, 1003 (8th Cir. 2005) (citing Berkemer v. McCarty, 468 U.S. 420, 440-42 (1984)).

Although Diaz-Quintana was not free to leave by virtue of the traffic stop and the extension of the traffic stop to determine his immigration status, that alone does not trigger Miranda. A traffic stop entitles the officer to conduct a brief and reasonable investigation which may include questioning. Only when the traffic stop becomes the equivalent of a full custodial arrest are Miranda warnings required. Trooper Messer questioned Diaz-Quintana during the course of completing the underlying traffic stop and the issuance of a citation. This was a Terry stop that did not trigger Miranda.

Border Patrol Agent Bane asserts in his affidavit that it was his intention to have Diaz-Quintana taken into administrative custody and to be processed administratively rather than criminally. Consequently, Diaz-Quintana was taken to the Stark County Law Enforcement Center in Dickinson and then to the Border Patrol station in Portal. Once in Portal, it was determined that Diaz-Quintana was in the United States illegally. At that time, he was placed under arrest. As established above, Diaz-Quintana was not under custodial arrest when he was transported to the law enforcement center and then to the Border Patrol station. Instead, he was merely going through the administrative processing necessary to fully investigate his immigration status and to determine whether full custodial arrest was warranted. Thus, Diaz-Quintana was not subjected to a detention

equivalent to formal arrest until after Agent Lotvedt learned of his criminal and immigration history, and placed him under arrest while at the Border Patrol station. Under the totality of the circumstances, the Court finds that Diaz-Quintana was not "in custody" for purposes of <u>Miranda</u> until he was placed under arrest at the Border Patrol station. A reasonable person would have considered the continued detention of Diaz-Quintana to be a mere extension of the traffic stop so that his immigration status could be determined. Therefore, the reading of <u>Miranda</u> rights was not required before this time and any evidence obtained prior to this point is admissible.

Once Agent Lotvedt determined that Diaz-Quintana was in the United States illegally, Diaz-Quintana was placed under arrest and was read his <u>Miranda</u> rights. At that point, Diaz-Quintana agreed to talk to Agent Lotvedt. Only after the <u>Miranda</u> rights were read did Diaz-Quintana make incriminating statements regarding his immigration status. Therefore, the incriminating statements made after <u>Miranda</u> are admissible.

### III.     <u>CONCLUSION</u>

The Court finds that Diaz-Quintana's Fourth and Fifth Amendment rights were not violated. Therefore, the Court **DENIES** the Defendant's Motion to Suppress Evidence (Docket No. 19).

**IT IS SO ORDERED**.

Dated this 6th day of February, 2009.

*/s/ Daniel L. Hovland*
Daniel L. Hovland, Chief Judge
United States District Court